UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| SKURKA AEROSPACE, INC., | ) | Case No.: 1:08 CV 1565 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| EATON AEROSPACE, L.L.C., | ) | |
| | ) | |
| Defendant | ) | <u>ORDER</u> |


Currently pending in the above-captioned case are: (1) Plaintiff Skurka Aerospace, Inc.'s ("Skurka" or "Plaintiff") Request for a Preliminary Injunction (ECF No. 43-1); and (2) Defendant Eaton Aerospace L.L.C.'s ("Eaton" or "Defendant") Request for a Preliminary Injunction (ECF No. 50). For the following reasons, the court grants in part and denies in part Plaintiff's Motion for a Preliminary Injunction (ECF No. 43-1), and denies Defendant's Motion for a Preliminary Injunction.

Also pending before this court is Eaton's Motion to Strike the Supplemental Declaration of Dr. Michael J. Dreikorn (ECF No. 101). The court denies Eaton's Motion to Strike.

## I.  FACTS AND PROCEDURAL HISTORY

The parties entered into an Asset Purchase Agreement ("APA") on June 30, 2005, under which Skurka acquired substantially all of the assets of an Eaton division in Burbank, California, which was engaged in the design, manufacture, sale support and repair of motors used primarily in the aerospace industry.

The parties also entered into a Supply Agreement, which required Eaton to purchase certain specific motor products exclusively from Skurka from June 30, 2005, through June 30, 2012. Skurka agreed to supply Eaton with all of the products it required during this time period. Eaton could order products for "OEM airframe production" for a standard price and could order aftermarket motors and components at a higher price. Skurka claims that Eaton misrepresented orders to be for OEM airframe production when in fact they were for aftermarket uses, and consequently, Eaton should have paid higher prices for the products ordered.

Skurka alleges: (1) Eaton breached the Supply Agreement; (2) the court should issue a declaratory judgment stating that "any Products Eaton purchases from Skurka pursuant to the Supply Agreement that are utilized as part of a 'cargo conversion' should be priced at aftermarket pricing and not OEM airframe production pricing"; (3) Eaton breached the APA by retaining certain intellectual property, defined in the APA ("Intellectual Property"); (4) Eaton converted certain Intellectual Property owned by Skurka; (5) Eaton has misappropriated trade secrets that belong to Skurka; (6) Skurka is entitled to replevin of specific Intellectual Property; (7) Eaton committed fraud by submitting false purchase orders to Skurka and deliberately not disclosing and misrepresenting information regarding Eaton's continued retention of copies of Skurka's Intellectual Property; and (8) Skurka is entitled to receive a full accounting of the proper pricing classification of all products sold to Eaton from July 1, 2005 to present.

Eaton filed an Answer and Counterclaim on September 2, 2008 (ECF No. 7). Eaton filed an Amended Counterclaim on September 21, 2009 (ECF No. 42), in which it alleged that Skurka breached the Supply Agreement by: (1) failing to meet quality standards; (2) failing to timely deliver products; (3) making unapproved design and manufacturing changes; and (4) refusing to provide

required drawings and information.  Also, Eaton alleged that Plaintiff breached the express warranty "in Section 1.1 of the Supply Agreement that any products consisting of new motors, components or sub-assemblies manufactured by Skurka pursuant to the Supply Agreement would be free from defects in materials and workmanship for a minimum period of twelve months after delivery to Eaton."  In Count VI, Eaton alleges that it is entitled to a declaratory judgment that it has the right to retain drawings and information.  In Count VII, Eaton further alleges that it is entitled to a declaratory judgment stating that "motors and parts sold and intended for use in 'cargo conversion' or similar retrofit programs are a first-use application subject to OEM pricing under the Supply Agreement."

## II. MOTION TO STRIKE

Defendant argues that Dr. Dreikorn's Supplemental Declaration (ECF No. 100), filed by Plaintiff in support of its Motion for a Preliminary Injunction, should be stricken from the record because his statements are irrelevant and unsupported and because Eaton was not given an opportunity to cross-examine Dr. Dreikorn on this issue.  Defendant filed a Supplemental Declaration of Brad Twesten, who is an employee of Eaton, along with a letter from the Federal Aviation Administration ("FAA"), in which a representative from the FAA answered questions from Mr. Twesten ("FAA letter") (ECF No. 99).  Plaintiff responded with the Supplemental Declaration at issue.  The court has already heard extensive testimony on the issue of whether the FAA requires copies of design drawings to be at Eaton's facility.  This Supplemental Declaration more or less reiterates the same testimony made by Plaintiff's witnesses at the preliminary injunction hearings, albeit in the context of the new FAA letter. Both parties have been able to weigh in on this issue, and it would be unfair to prevent Plaintiff from filing the Supplemental Declaration.  The court hereby

-3-

denies Defendant's Motion to Strike.

### III. PRELIMINARY INJUNCTION

#### A. Legal Standard for a Preliminary Injunction

A preliminary injunction is an extraordinary remedy that requires the party seeking relief to demonstrate a clear entitlement to the injunction. *Overstreet v. Lexington-Fayett Urban Cty. Gov't,* 305 F.3d 566, 573 (6th Cir. 2002). Courts consider four factors in determining whether to issue a preliminary injunction: (1) whether the movant has demonstrated a substantial likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction will cause substantial harm to others if issued; and (4) whether the public interest is served by issuance of the injunction. *Id.*; *Tucker v. City of Fairfield*, 398 F.3d 457, 461 (6th Cir. 2005). The Sixth Circuit has recognized that "these factors are not prerequisites, but are factors that are to be balanced against each other." *Overstreet,* 305 F.3d at 573 (citation omitted). No single factor is dispositive; rather, a court must balance the factors to determine whether equitable relief is appropriate. *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996); *Mich. Bell Tel. Co. v. Engler*, 257 F.3d 587, 592 (6th Cir. 2001).

If a party can show the likelihood of success on the merits of any of its claims, then the court may properly enter a preliminary injunction. *Hoover Transp. Servs., Inc. v. Fraye*, 77 F. App'x 776, 781 (6th Cir. 2003) ("If Hoover can show a likelihood of success on the merits of any of the claims, an injunction may issue, subject to consideration of the other factors."). Similarly, a party need only demonstrate a likelihood of success on the merits on the "central issue" of a party's claims in order to satisfy this prong. *Six Clinics v. Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997) ("With regard to ARN's claims of breach of fiduciary duties, we find that it is not

-4-

necessary to evaluate ARN's likelihood of success on each one. For purposes of a preliminary injunction, it is enough that ARN has demonstrated a likelihood of success on the central issue of Cafcomp's status as a fiduciary.").

## B. Law and Analysis

In Plaintiff's Request for a Preliminary Injunction (ECF No. 43-1), Plaintiff asks the court to require Defendant to: (1) transfer to Skurka all Intellectual Property described in the Asset Purchase Agreement; (2) delete, destroy, or remove all copies of Intellectual Property in Defendant's possession; and (3) cease and desist from further unauthorized use and/or disclosure of said Intellectual Property to third parties.

In Defendant's Request for a Preliminary Injunction (ECF No. 50), Eaton requests that the court: (1) require Plaintiff to provide Defendant current design documentation (including drawings, specifications, protocols and related information) pertaining to the products sold to Eaton by Skurka; (2) find that Eaton is entitled to maintain copies of Skurka design drawings and related documents for the purposes set forth in the Supply Agreement and to comply with FAA regulations; and (3) require Plaintiff to make copies of design drawings and related documents available to Defendant as needed for Defendant to perform activities set forth in the Supply Agreement and to comply with FAA Regulations.  (Def.'s Mot. for Prelim. Inj., ECF No. 50, at pp. 2-3.)

### 1.  Preliminary Injunction Hearing

The court held hearings on the preliminary injunction motions on December 14 and 15, 2009, and April 26 and 27, 2010.  During the hearings, Plaintiff called two witnesses, and Defendant called five witnesses.

#### (a) Plaintiff's Witnesses

Plaintiff called two witnesses at the preliminary injunction hearing: (1) Mr. Tom Sievers, President of Skurka Aerospace in Camarillo, California; and (2) Mr. Michael Dreikorn, an aviation expert.

### (i) Mr. Tom Sievers

Mr. Sievers explained that Skurka acquired the Eaton motor business in Burbank, California, in mid-2005 for $9.5 million.  (Tr. Trans., ECF No. 68, at pp. 57-58 (Sievers Testimony).)  He believes that the most valuable aspect of the purchase was the Intellectual Property.  (*Id.*, at p. 58.) Mr. Sievers testified about two instances when Defendant sent drawings owned by Skurka to two of Skurka's competitors, Motion Tech and Preco.  (*Id.*, at pp. 71-72.)  He further testified that he believed the design drawings to be trade secrets.  (*Id.*, at p. 81.)  Mr. Sievers was called again as a rebuttal witness by Plaintiff after Defendant's witnesses testified. (Tr. Trans., ECF No. 80, at p. 718.)

### (ii) Mr. Michael Dreikorn

Dr. Dreikorn has been in the aviation field for years, and in addition to working at other places, he worked for McDonald Douglas as a quality engineer and a quality procurement specialist. (Tr. Trans., ECF No. 71, at p. 187.)  He was later vice-president of quality assurance and product integrity at Pratt & Whitney.  (*Id.*, at p. 189.)  Dr. Dreikorn testified about FAA regulations and guidelines and how they relate to Skurka's and Eaton's relationship.

### (b) Defendant's Witnesses

Defendant called five witnesses at the preliminary injunction hearing: (1) Mr. Thomas McSweeny; (2) Mr. Michael Ritter; (3) Mr. Daniel Carroll; (4) Mr. Brad Twesten; and (5) Mr. Peter Foote.

### (i) Thomas Edmond McSweeny

-6-

Mr. McSweeny worked for the FAA for 27 and ½ years, starting as a project engineer and worked his way to be the administrator for Regulations and Certification, which is one of the highest nonpolitical positions in the FAA.  In total, Mr. McSweeny has 43 years of experience in the aerospace industry.  He testified that in his opinion, current design drawings need to reside at Eaton's Grand Rapids facility, and that alternatives to this arrangement are not viable.  Further, he stated that Eaton and the aviation industry will suffer harm if the drawings are removed from Eaton's possession.  (Tr. Trans., at p. 281 (McSweeny Testimony).)

### (ii)  Michael Ritter

Mr. Ritter is the quality supervisor for Eaton.  He started with Eaton in 2004 as a product engineer.  He currently supervises the receiving inspection department, paint, shipping, and final inspection.  (Tr. Trans., at p. 365 (Ritter Testimony).)  He testified about the inspection process and in particular the "skip lot" procedure, which means Eaton will only dimensionally inspect some of the products delivered to it (*Id.*, at pp. 370-71), and the use of specification control drawings.  Mr. Ritter further discussed Skurka's history of supplying drawings to Eaton.

### (iii) Daniel Carroll

Mr. Carroll is Vice President of Supply Chain at Eaton.  He testified about quality control and inspections, including the "skip lot" and the "dock to stock" programs.  "Dock to stock" is similar to the "skip lot" program, but Eaton inspects the shipments at less frequent intervals under the "dock to stock" program.  Mr. Carroll also explained that Eaton performs source inspections in addition to, not in lieu of, a receiving inspection.  (Tr. Trans., at p. 503 (Carroll Testimony).)

### (iv) Brad Twesten

Brad Twesten is the Quality Manager at Eaton.  Mr. Twesten testified about the

manufacturing side of an FAA inspection. (Tr. Trans., at p. 626 (Twesten Testimony).) He further testified that he was in close contact with Craig Justus, who is Eaton's principal inspector from the FAA. He stated that Mr. Justus represented that the drawings needed to be readily available in Grand Rapids. (*Id.*, at p. 638.) He further stated that in his opinion, Eaton was currently not in compliance with FAA regulations "[b]ecause 21.303(h)(6) requires us to have the current drawings readily available in Grand Rapids." (*Id.*, at 638-39.) Mr. Twesten explained that he believes that the reason the FAA has not yet decided to cite Eaton for noncompliance is because he has been in close communication with Mr. Justus. (*Id.*, at p. 671.)

(v) Peter Foote

Peter Foote is Eaton's Manager of Mechanical Engineering. (Tr. Trans., at p. 673 (Foote Testimony).) He testified about how Skurka's drawings have been maintained at Eaton's facility. He further testified about the design change note process. (*Id.*, at pp. 677-78.) Skurka would submit a design change note, or DCN, by email to Eaton that corresponded with shipments of parts whose designs had changed. Skurka also attached drawings to the DCN "[f]rom the date of acquisition through to the latter part of 2008." (Foote 677.) Mr. Foote discussed Skurka's requests for drawings from Eaton that it believed Eaton had not turned over and the detailed search Eaton undertook to find these documents in 2008.

### 2. Application of Standard for Preliminary Injunction to Plaintiff's Claims

(a) Substantial Likelihood of Success on the Merits

(i) Breach of Contract Claim

Plaintiff maintains that the following provisions support its claims that Eaton must turn over all right, title, and interest in the Intellectual Property to Skurka and that Skurka alone retains the

-8-

right to use the Intellectual Property.  The contract refers to Eaton as "Seller" and Skurka as "Buyer."

The relevant Sections of the APA are: 2.1, 5.7, and 12.1.  Relevant provisions of Section 2.1 are:

> Transferred Assets.  On the terms and subject to the conditions of this Agreement, and for the consideration set forth in Article 4, the Seller shall, on the Closing Date, sell, transfer and convey to the Buyer, free and clear of all Liens, other than the Assumed Liabilities, all of the Seller's right, title and interest in and to the assets that are used primarily or exclusively to operate in the Business as currently operated by the Seller, ...including, to the extent used primarily or exclusively to operate the Business as currently operated by the Seller, the following: ... (e) Intellectual Property.  All of the Intellectual Property ... .

Relevant provisions of Section 5.7 are:

> Conditions and Sufficiency of Transferred Assets. ... Except as set forth on the Corresponding Schedule, the Fixed Assets, Records and Know-How included in the Transferred Assets constitute all of the assets of the type defined in such defined terms which are necessary to (i) operate the Business in all material respects in the manner presently operated by Seller and (ii) to manufacture all motors and sub-assemblies currently or previously manufactured in the Business, including, without limitation, those motors and sub-assemblies listed on the Corresponding Schedule ... .

Relevant provisions of Section 12.1 are:

> The Closing Date.  The Closing shall take place at the offices [of] McDonald Hopkins Co., LPA, Cleveland, Ohio, at 10:00 a.m., Cleveland, Ohio local time, on the date of execution of this Agreement (the "**Closing Date**").  Notwithstanding the foregoing, the Closing shall be deemed to be effective as of 11:59 p.m., Cleveland, Ohio local time, on the Closing Date.

Plaintiff also argues that Section 1.5 of the Supply Agreement supports its breach of contract claim.  Section 1.5 states:

> Intellectual Property Rights.  Subject to Section 3.3(d), all intellectual property rights to the Products are owned by and shall remain with

-9-

> Supplier.  In no event will Eaton use proprietary information of Supplier related to the Transferred Assets or the Products for any purpose not contemplated by this Agreement, including in order to obtain competitive bids.

Therefore, the plain language of the contracts gives Skurka the rights to the Intellectual Property.

Eaton maintains that the following provisions require it to maintain drawings:

Section 1.1 of the Supply Agreement states:

> For purposes of this Supply Agreement, the term 'Products' shall mean the aerospace motors, motor sub-assemblies and motor components incorporating the Intellectual Property included in the Transferred Assets, but excluding those items set forth on Appendix A hereto.

The APA defines "Intellectual Property" as including "designs" and "drawings," among other things.  (APA, at p. 4.)

Sections 1.2(c) and 1.2(d) of the Supply Agreement state:

> (c)  Eaton shall promptly notify Supplier of any Eaton identified non-conformance of any Products via a "Non-Conforming Material Report" or other similarly titled document. . . .
>
> (d)  Eaton and Supplier agree that the Products ordered pursuant to this Supply Agreement are unique goods.  If Supplier delivers defective or non-conforming Products, Eaton may at its sole option:
>> (i)  accept all or part of a delivery . . .
>> (ii)  reject all or any part of a delivery or defective or non-conforming Products, and demand delivery of conforming Products, with all rejected Products to be returned to Supplier for investigation;
>> (iii)  Supplier and Buyer shall address Supplier's implementation of Buyer's Worldwide Integrated Seller Performance and Evaluation Resource ("WISPER") during Supplier's next Supplier quality approval process.

Section 3.5 of the Supply Agreement states, in relevant part, that:

-10-

> Supplier may not change any suppliers of materials or components for any single Product until that particular Product satisfactorily passes Eaton's First Article Inspection pursuant to AS9102 requirements as described in Section 1.2(a).

Section 11.1 of the APA states, in relevant part, that:

> Seller may make minor repairs for its customers so long as the components for making such repairs are purchased pursuant to the Supply Agreement.

Therefore, the basis of Eaton's argument is that the language of the Supply Agreement that requires Skurka to supply Eaton with products "incorporating the Intellectual Property" means that Skurka must provide copies of design drawings along with its product shipments.  Eaton maintains that it could not "make minor repairs [or] approve proposed changes to the Products" without having these design drawings.

### (a) Plaintiff's Argument

Plaintiff argues that the APA required Eaton to sell, transfer, and convey to Skurka all of its right, title, and interest in the Intellectual Property.  Plaintiff further argues that Eaton failed to completely divest itself of the Intellectual Property and retained copies of all such property.  Plaintiff alleges that Defendant breached Sections 2.1, 5.7, and 12.1 of the APA and Section 1.5 of the Supply Agreement.  In support of its argument, Plaintiff cites the testimony of Mr. Carroll, who is the Vice President of the Supply Chain for Eaton Aerospace (Tr. Trans., at p. 495), stating that Skurka has the right to have the Intellectual Property returned to it, and if Skurka wants all of its Intellectual Property back, then "they can have it back."  (*Id*., at p. 566 ("It is their right, and if they want it back, they can have it back. But there is no substitute for us to provide reference to our inspection documentation.").)  Plaintiff further states that Eaton's argument that Section 1.1 of the Supply Agreement, which requires Skurka to deliver "Products" to Eaton, obligates Skurka to transfer back

-11-

to Eaton the same Transferred Assets, Intellectual Property, that Eaton transferred to Skurka under the APA, is nonsensical and untrue.  Plaintiff also argues that Eaton's position is inconsistent with Sections 1.2(b)[1] and 3.3(d)[2] of the Supply Agreement, which provide Eaton limited access to the Intellectual Property.

### (b) Defendant's Argument

Defendant argues that it is likely to succeed on the merits because: (1) Plaintiff is barred by the APA's limitations clause; (2) the APA provides that the exclusive remedy for a violation is indemnification; (3) the Supply Agreement requires Plaintiff to provide Eaton with the design drawings; (4) FAA regulations require Eaton to maintain copies of the design drawings; (5) the parties' course of performance establishes that Eaton is entitled to possess and use the design drawings; (6) Eaton's express rights under the APA and Supply Agreement cannot be exercised without Eaton's implied right to possess and use the design drawings; and (7) Skurka's withholding of updated design drawings is a violation of its duty of good faith and fair dealing.

### *(1) Statute of Limitations*

Defendant argues that Plaintiff is barred by the APA's limitations period.  Article 15.1 of the APA contains a claims survival provision that provides: "[a]ll of the representations, warranties, covenants and agreements of the Seller and Buyer contained in this Agreement and all unasserted claims and causes of action with respect thereto shall terminate upon expiration of the two years

---

[1]  "If required by applicable law or governmental regulation, Supplier shall provide Eaton reasonable access to all manufacturing and inspection records for the applicable Products."

[2]  ". . . if any delivery delay of a Products [sic] extends ninety (90) days beyond the delivery date . . . Supplier shall provide to Eaton reasonable access to Supplier's intellectual property . . . necessary for the manufacture of those Products . . . ."

following the Closing Date," excluding certain representations and warranties not at issue in the Second Amended Complaint. The Closing Date of the APA was June 30, 2005, more than three years before the original Complaint was filed.

Plaintiff counters that: (1) the statute of limitations should not apply because section 12.4 of the APA vested ownership rights in the Intellectual Property with Skurka on the closing date of the agreement; (2) Skurka submitted its claim within two years because in its Complaint, filed on June 27, 2008, it "specifically alleged that in a March 30, 2007 email to Eaton it 'identif[ied] and set[] forth Skurka's claim to the Intellectual Property that Eaton failed to transfer'"; and (3) Eaton should be equitably estopped from relying on the statute of limitations. (Pl.'s Memo. in Opp. to Mot. to Dismiss, ECF No. 53, at pp. 15-16.)

In support of its argument that the statute of limitations does not apply, Plaintiff argues:

> [a]s a threshold matter, pursuant to the express terms of Section 12.4 of the APA, Skurka's ownership rights in the Intellectual Property commenced and vested on the Closing Date. It is undisputed that Skurka owns the Intellectual Property and nothing in the APA allows Eaton to suggest that Skurka's ownership expired two years following the Closing Date. Section 15.1 is therefore inapplicable.

(*Id.*, at p. 15) Skurka does not cite any case law in support of its assertion. In addition, while Skurka's argument makes logical sense, Skurka does not explain what type of claims the statute of limitations in the contract would apply to.

However, Plaintiff sets forth a viable argument that it notified Defendant of its breach of contract claim before the two-year limitations period ended. Section 15.2 of the APA states that if "notice of any claim for indemnification is given . . . within the applicable survival period and not resolved within such period, the representations, warranties, covenants and agreements that are the subject of such indemnification claim shall survive until such time as such claim or claims are finally

-13-

resolved . . . ." Plaintiff gave Defendant notice of its claim in an email on March 30, 2007, a month before June 30, 2007, the end of the two-year time-period.

Plaintiff also argues that Defendant is equitably estopped from relying on the two-year statute of limitations. To prove a prima facie case for equitable estoppel, Plaintiff must "prove four elements: (1) that the defendant made a factual misrepresentation; (2) that it is misleading; (3) [that it] induces actual reliance which is reasonable and in good faith; and (4) . . . [that the reliance] causes detriment to the relying party." *Doe v. Blue Cross/Blue Shield of Ohio*, 607 N.E.2d 492, 498 (Ohio App. 10 Dist. 1992) (citing *First Fed. S. & L. Assn. v. Perry's Landing, Inc.*, 463 N.E.2d 636, 648 (Ohio App. 3d Dist. 1983)). If Plaintiff proves that Defendant meets this test, then it would be appropriate to equitably estop the statute of limitations period. *Schrader v. Gillette*, 549 N.E.2d 218, 221 (Ohio 1988). Skurka alleged that Eaton represented that it "retained no documentation relating to the IP sold to Skurka." (Am. Compl., ¶ 15.) It is clear from the testimony at the Preliminary Injunction hearing and Eaton's submissions that Eaton has retained Skurka's Intellectual Property. Therefore, Plaintiff has presented some evidence to show that Eaton made misrepresentations that Skurka reasonably relied upon and that this reliance caused Skurka to suffer an injury. At this stage, the court finds that the statute of limitations in the APA should not prevent Skurka from receiving preliminary injunctive relief.

*(2) Exclusive Remedies of the APA*

Defendant argues that the APA makes indemnification the exclusive remedy for any alleged breach and sets a minimum threshold claim amount of $100,000. (APA, Arts. 16.1, 16.3, 16.7). Article 16.1 states, in relevant part, that, "the Seller agrees to indemnify the Buyer against any loss, cost, liability or expense . . . incurred by the Buyer." Section 16.3 states, in relevant part, that, "[a]

-14-

Party may bring a claim seeking indemnification . . . under the terms and provisions of this Article 16 only if such claim, either alone or when aggregated with other claims for indemnification by such party, exceeds $100,000." Section 16.7 states in full:

> Exclusive Remedy. Except as otherwise expressly provided for in this Agreement, following the Closing, the indemnification provided by this Article 16 shall be the exclusive remedy for the Buyer or the Seller, as the case may be, with respect to this Agreement and the transactions contemplated by this Agreement other than claims of fraud.

Plaintiff argues in response that an indemnification provision only applies when a party claims a "quantifiable loss" and therefore cannot apply to Plaintiff's request for specific performance for its breach of contract claim. (Pl.'s Memo. in Opp. to Mot. to Dismiss, ECF No. 53, at p. 13.) Plaintiff further argues that permitting Article 16 of the APA to bar its claim for specific performance would go against the purpose of the APA, which was written to permit Plaintiff to acquire assets of Eaton's business. (*Id.*, citing APA §§ 2.1, 4.1.)

Courts have held that contractual language limiting the parties' liability or remedies should be enforced absent vagueness, ambiguity, or unconscionability. *Morantz v. Ortiz*, Sl. Op. No. 07AP-597, 2008 WL 642630, at *7, (Ohio App. 10th Dist. March 11, 2008); *TLC Healthcare Servs., L.L.C. v. Enhanced Billing Servs., L.L.C.*, No. L-08-1121, 2008 WL 3878349, at *3, (Ohio App. 6th Dist. Aug. 22, 2008) ("[P]arties may agree to limit or expand the scope of the remedies available upon breach with an express provision in a contract."); *see also Royal Indem. Co. v. Baker Protective Servs.*, 515 N.E. 2d 5, 7 (Ohio App. 2d Dist. 1986) ("An important function of contract law is to enforce the parties' agreed-upon allocation of risk."). However, courts should interpret contracts in a way that avoids absurd results, and a term cannot be interpreted in a way different than the meaning of express provisions in the contract. *Juergens v. Strileckyj*, Sl. Cop., 2010 WL 4158508, *4 (Ohio

App. 2 Dist. Oct. 22, 2010) ("[I]t may be necessary to stray from a plain reading of the agreement's terms if such a reading produces an absurd result. . . . Likewise, words in an agreement may be interpreted differently if the agreement itself evidences some other meaning.") (citation omitted); *Zimmerman v. Eagle Mtge. Corp.*, 675 N.E.2d 480, 488 (Ohio App. 2 Dist. May 3, 1996) ("When interpreting contracts, common words will be given their ordinary meaning unless it would lead to an absurd result, or unless the contract itself evidences some other meaning.") (citing *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 149-150 (Ohio 1978) (superseded by statute on other grounds)).

In this case, other articles of the APA support Plaintiff's argument.  Plaintiff maintains that because Section 16.3 requires a threshold amount of $100,000 for the indemnification provisions to apply, it must only apply to claims for monetary damages.  Similarly, because Section 16.10 limits all aggregate indemnification to $5 million, Plaintiff argues that the parties intended for the indemnification provision to only apply to claims for monetary damages. Section 16.5 refers to " Third-Party Claims" involving " solely monetary damages."  Plaintiff argues that indemnification is limited to general or direct damages because Section 16.11 exonerates both parties from liability for consequential, special or incidental damages incurred as a result of breach of the APA. Moreover, Plaintiff maintains that Section 16.7 contemplates other remedies beyond indemnification. Section 16.7 provides:

> Exclusive Remedy. ***Except as otherwise expressly provided for in this Agreement***, following the Closing, the indemnification provided by this Article 16 shall be the exclusive remedy for the Buyer or the Seller, as the case may be, with respect to this Agreement and the transactions contemplated by this Agreement other than claims of fraud.

(Emphasis added).  Plaintiff reads this section to "confirm[] that the other terms of the APA are to

-16-

be enforceable and are not to be vitiated by the indemnification provision Eaton seeks to invoke."
(Pl.'s Memo. in Opp. to Mot. to Dismiss, ECF No. 53, at p. 14.)

The court finds that the indemnification provision is not likely to prevent Skurka from succeeding on its claim for breach of contract.  Skurka has put forth a viable argument that the indemnification language in the APA does not apply to the specific performance claim seeking to enforce rights explicitly set forth in the Agreement itself.  Sections 2.1 and 12.4 provide that on June 30, 2005, all "right, title and interest," including the "right to possession," in all business assets transfer from Eaton to Skurka.  APA §§ 2.1(a), 12.4.  As such, the court finds that the indemnification clause in the APA does not bar Plaintiff from receiving injunctive relief.

*(3) Plaintiff must provide Eaton with "Products," which include the design drawings*

Eaton argues that Skurka is breaching the express terms of the Supply Agreement each time it refuses to provide Eaton with copies of the design drawings.  (Supply Agr., § 1.1; APA, at p. 4.) Section 1.1 of the Supply Agreement defines "Products" as "the aerospace motors, motor sub-assemblies and motor components incorporating the Intellectual Property included in the Transferred Assets, but excluding those items set forth on Appendix A hereto."  The Asset Purchase Agreement defines "Intellectual Property," which Defendant argues includes Products.

The court is not persuaded by this argument as the contract language expressly grants Skurka the rights to the Intellectual Property.  (*See* APA, §§ 2.1, 5.7, 12.1; Supply Agr., § 1.5.)  Even under the plain meaning of Section 1.1, Skurka is only required to give aerospace motors, motor sub-assemblies, and motor components to Eaton.  The provision, "incorporating the Intellectual Property," should be read to mean that the motors, motor sub-assemblies, and motor components were created using Intellectual Property.  Eaton is not likely to succeed on the merits of its claim that

-17-

the above sections require Skurka to provide its Intellectual Property to Eaton.

*(4) FAA regulations require Eaton to maintain copies of the design drawings*

Eaton is the holder of Parts Manufacturer Approval (" PMA") authority from the FAA over virtually all of the motors and components Skurka supplies to Eaton.  Eaton's PMA status imposes significant obligations upon Eaton, including the requirement that current design drawings for all applicable parts be "readily available" to Eaton, so that they can be "used when necessary."  *See* 14 C.F.R . § 21.303(h)(6) ("Current design drawings must be readily available to manufacturing and inspection personnel, and used when necessary.").  Eaton must also maintain design drawings so that its manufacturer customers can access the "technical data file" that they are required to maintain pursuant to FAA regulations.  14 C.F.R. § 21.293.

Eaton argues that these regulations create an  implied right for Eaton to possess design drawings during the course of its business relationship with Skurka.  (Def.'s Memo. in Supp. of Mot. for Prelim. Inj., ECF No. 52, at p. 23.)  In its Opposition, Plaintiff argued that an implied term cannot exist if it contradicts the language of the agreement.  (Pl.'s Combined Reply Memo. in Supp. of its Mot. for Prelim. Inj., ECF No. 58-1, at pp. 11-12, citing *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.*, 274 714 N.E.2d 898, 902 (1999) ("There can be no implied covenants in a contract in relation to any matter specifically covered by the written terms of the contract itself.").)

At the preliminary injunction hearing, Skurka presented further arguments against finding an implied right to retain design drawings.  First, Skurka argued that FAA compliance was not the motivating factor for Eaton to retain the copies of the drawings.  According to Plaintiff, Eaton chose to retain the Intellectual Property, so Eaton could re-source production if Skurka became unable to deliver parts. (Pl. Ex. 135 (String of emails between Ramon Frausto of Eaton and Steve Parker of

Eaton, stated in part that, "Eaton MUST retain access to all IP sold to Skurka.  In the event they are unable or unwilling to deliver these parts we can and will make them ourselves.  Do not delete ANY data before we have a plan to access it in the future."); (J. Ex. 137 (Email from Steve Parker to Ed Kalvenas of Eaton stated that "our Engineering folks were instructed to keep originals of all data - in the event they defaulted and we need to have some[one] else make the motors.").)  Skurka further argues that Eaton retained copies of Skurka's Class 2 change drawings so Eaton could "continue purchasing these parts for aftermarket spares."  (Pl. Ex. 115 (Mtg. Minutes).)  Further, Skurka presented testimony that a large portion of the Intellectual Property that Eaton is retaining is not related to products that it sells, which means that it would not need that Intellectual Property to comply with FAA regulations.  (Tr. Trans. (Sievers Testimony)), at p. 110-11 ("Q. Mr. Sievers, is there a group of documents that Eaton is holding on to that relate to motors that Skurka doesn't sell to Eaton anymore? A. As I mentioned earlier there is large population of intellectual property associated with these motors that we bought. There is a subset of those that we actually deliver to Eaton on a regular basis. But there is a whole larger population of motors that we deliver to customers like Hamilton Sunstrand, to Parker, to the U.S. government, to Meggitt Safety Systems to Boeing, that Eaton still retains possession of . . . .").)

Second, both Dr. Dreikorn for Plaintiff and Mr. McSweeny for Defendant testified that Eaton did not need Skurka's detailed design drawings in order to comply with FAA regulations.  For example, testimony revealed that:

(1)     It is uncommon for PMA holders to posses proprietary drawings of their suppliers. (Tr. Trans., at pp. 199 (Dreikorn) ("But it is unheard of for a production approval holder to have proprietary designs of their suppliers, especially to the detail level."),

-19-

          270 (Dreikorn), 343 (McSweeney) ("It is common that [the supplier] holds its detailed drawings.").)

   (2)    Eaton could create specification control drawings ("SCDs") in order to comply with all FAA regulations and with Eaton's FAA-approved fabrication inspection system. (Tr. Trans., at pp. 219 (Dreikorn), 272 (Dreikorn), 325-26 (McSweeny).)

   (3)    The FAA cannot compel a supplier to turn over its proprietary drawings. (Tr. Trans., at pp. 198 (Dreikorn), 337 (McSweeny).)

   (4)    Eaton can comply with FAA regulations and its fabrication inspection system by performing source inspections.  (Tr. Trans., at pp. 205-06 (Dreikorn), 344-47 (McSweeny).)

   (5)    Eaton does not need detailed design drawings to perform some types of receiving inspection. (Tr. Trans., at pp. 267 (Dreikorn), 349 (McSweeny).)  In fact, SCDs are common in situations where suppliers hold proprietary drawings.  (Tr. Trans., at p. 343 (Dreikorn).)

In addition, Mr. Carroll of Eaton conceded that Eaton only needs to have access to current drawings to satisfy FAA regulations and that Eaton does not "need to have them sitting in Grand Rapids." (Tr. Trans, at p. 572.)

Third, Skurka presented evidence that Eaton knowingly violated FAA regulations in 2005 in order to continue its possession of Plaintiff's Intellectual Property.  The FAA requires that a PMA holder "notify the FAA in writing within 10 days from the date the manufacturing facility at which the parts are manufactured is relocated or expanded to include additional facilities at other locations."  14 C.F.R. 21.303(j).  Skurka argues that Eaton did not give the FAA written notice of

-20-

an additional facility or that Eaton changed its design control processes when it purchased Eaton's Burbank facility.  (Tr. Trans., at pp. 210-11, 270-71, 648-49.)

As of the Preliminary Injunction hearing, the FAA had yet to cite Eaton or threaten sanctions, and this includes the FAA's January 2010 inspection.  (Tr. Trans., at pp. 472-73, 638, 659-60, 666-67; Def, Ex. 613.)  Eaton argues that the reason for this is that Eaton has kept the FAA closely informed of this case.  Eaton adds that Craig Justus, the FAA's Principle Inspector of Eaton, was clear that "[i]f Eaton did not have the drawings, we would violate Eaton in accordance with [14 C.F.R.] 21.303(h)(1), (h)(6) or 21.303(k)."  (Joint Ex. 62, Email from Craig Justus.)

On May 14, 2010, Frank P. Paskiewicz, Manager of the Production and Airworthiness Division of the FAA, sent a letter to Bradley Twesten at Eaton Aerospace answering two questions Mr. Twesten submitted to the FAA.  (FAA Letter, ECF No. 99-1, at p. 2.)  In response to the question, "Must all technical data required by Title 14, Code of Federal Regulations (14 CFR) § 21.303(c)(3) reside at the Eaton facility?", the FAA representative answered, "Yes.  A PMA approval letter issued to a PMA holder requires that all technical data required by 14 CFR § 21.303(c)(3) be readily available at the facility at which the parts are produced."  (*Id*.)  In response to the question, "Does the FAA require Eaton Aerospace to have readily available access to current drawings, as required by 14 CFR § 21.303 (h) (6)?", the FAA representative answered, "Yes.  The FAA requires that all current design drawings required by 14 CFR § 21.303 (h)(6) be readily available at the facility at which the parts are produced."  (*Id*.)

Plaintiff filed the Supplemental Declaration of Dr. Michael J. Dreikorn in response to the FAA letter.  (ECF No. 100-1.)  Dr. Dreikorn maintains that the letter does not answer the question of whether Eaton must retain detailed design drawings of Skurka's proprietary drawings.  Dreikorn

further maintains that 14 C.F.R. § 21.303(c)(3) does not require Skurka to have these detailed drawings.  Dreikorn stated:

> At its Grand Rapids facility, Eaton receives finished motors from Skurka and is not authorized to disassemble motors as part of its receiving inspection and/or installation processes.  All production and conformity related activities are being conducted by Skurka in Skurka facilities.  Eaton's possession of Skurka drawings does not facilitate compliance with applicable FAA regulations, but rather enables Eaton to conduct unauthorized repairs and modifications to Skurka motor assemblies. . . . Per 14 CFR § 21.303(c)(3), at most, Eaton only needs a top level drawing and/or specification control drawing to conform Skurka motors at [a] receiving inspection.  To relieve any need for Skurka drawings at Eaton, the preferable regulatory model would be for to [sic] Eaton establish effective supplier surveillance and inspection delegation processes so that product conformity could be determined at Skurka.

(*Id.*, at pp. 2-3.)  Dreikorn argues that Paskiewicz's response in the FAA letter that design drawings must be "readily available" "does not provide any new or additional insight to the definition of *readily available*."  (*Id.*, at p. 3.)

First, the court does not find that Defendant has shown at this stage that the APA or the Supply Agreement incorporate FAA regulations as implied terms.  As stated above, an implied term cannot contradict an express term of a contract, and the contract expressly grants Skurka the rights to the Intellectual Property.  Second, even if Defendant were able to show that the FAA regulations were incorporated into the contract, Defendant has not shown that the FAA requires Eaton to have copies of the Intellectual Property in its possession at its receiving facility.  FAA representative, Paskiewicz, did not clarify what "readily available" meant and instead largely reiterated the relevant terms of 14 CFR § 21.303 in his letter to Mr. Twesten.  Dreikorn and McSweeny testified that it is uncommon for PMA holders to posses proprietary drawings of their suppliers, that source inspections comply with FAA regulations, and that Eaton does not need detailed design drawings

-22-

to perform adequate receiving inspections.

*(5) The parties' course of performance establishes that Eaton is entitled to possess and use the design drawings.*

Eaton argues that Skurka's conduct in sending drawings to Eaton without demanding that Eaton destroy the drawings, and in failing to object to Eaton's possession and use of copies of the drawings, created a course of performance that is incorporated into the APA and the Supply Agreement. Peter Foote of Eaton testified that Skurka provided Eaton with updated design drawings when Skurka submitted a design change for approval; this occurred more than 1,100 times over the course of four years. (Tr. Trans., at pp. 679-82 (Foote Testimony).) Mr. Ritter of Eaton confirmed that Skurka knew that Eaton was retaining Skurka's drawings on its database. (Tr. Trans., at pp. 416-17 (Ritter Testimony).) Mr. Sievers, Skurka's current President, admitted that after seeing certain emails between employees at Skurka and employees at Eaton, he agrees that Skurka knew that Eaton was in possession of Skurka's drawings. (Tr. Trans., at pp. 153-54 (Sievers Testimony).)

The APA states that, "[n]o waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of such provision at any time in the future or a waiver of any other provision hereof." (APA, § 19.2.) Section 4.8 of the Supply Agreement states:

> The provisions of this Supply Agreement may be waived, altered, amended or repealed in whole or in part only upon the written consent of Eaton and [Skurka]. The waiver by either Party of any breach of this Supply Agreement shall not be deemed or construed as a waiver of any other breach, whether prior, subsequent or contemporaneous, of this Supply Agreement.

Anti-waiver provisions prevent a course of performance from changing a party's future rights pursuant to a contract. *E.g., Ed Wolf, Inc. v. National City Bank, Cleveland,* 1997 WL 25524, *7 (Ohio App. 8 Dist., Jan. 23, 1997) ("Past acceptance of late payments does not constitute a waiver

of the creditor's right to accelerate on a loan following a subsequent default where the loan document contains an anti-waiver provision."); *Metropolitan Life Ins. Co. v. Triskett Illinois, Inc.*, 646 N.E.2d 528, 532 (Ohio App. 1 Dist. Sept. 21, 1994) ("Metlife's acceptance of Triskett's February 28, 1991 . . . cannot be construed to constitute a waiver of Triskett's September 1990 through March 1991 defaults when the mortgage expressly provided that a "waiver * * * of any * * * default * * * shall [not] be deemed or construed to be a * * * waiver * * * of any other * * * default in the performance of the * * * obligations of" Triskett under the mortgage."); *Gaul v. Olympia Fitness Center, Inc.*, 623 N.E.2d 1281, 1286 (Ohio App. 8 Dist., June 21, 1993) ("It has been consistently held that a mortgagee's past acceptance of late loan payments does not constitute a waiver of the mortgagee's right to accelerate and foreclose on a loan following a subsequent default where the relevant loan documents contain "anti-waiver" provisions similar to those in the loan documents in this case."). In addition, Mr. Foote, of Eaton, on cross-examination, admitted that he did not believe that Skurka modified or changed the terms of the agreements through its limited sharing of Intellectual Property. (Tr. Trans., at pp. 709-10.)  Therefore, the court finds that Defendant's course of performance argument is not well-taken.

*(6) Eaton's express rights under the APA and the Supply Agreement cannot be exercised without Eaton's implied right to possess and use the design drawings.*

Eaton has the express rights to inspect the products Skurka delivers, to make minor repairs, and to approve proposed changes to the products.  (See Supply Agr. at §§ 1.2(c), 1.2(d), and 3.5; APA at § 11.1.)  Eaton argues that it would not be possible for Eaton to perform activities, such as inspection of products and certification of quality, expressly authorized by the Supply Agreement and required by FAA regulations, without having design drawings at its facility.  The court does not find Defendant's argument to be well-taken.  Defendant has the option of conducting source

-24-

inspections, and/or creating SCDs and top-level drawings used to inspect products or to make repairs at receiving.

*(7) Skurka's withholding of updated design drawings is a violation of its duty of good faith and fair dealing.*

Defendant argues that Plaintiff's withholding of design drawings is nothing more than an attempt to use its position as Eaton's exclusive supplier as leverage to force Eaton to accede to its unreasonable pricing demands put forth in its commercial claims in the litigation.  In light of the above findings of the court that Plaintiff is likely to succeed on the merits of its breach of contract claim, and in light of the APA and Supply Agreement provisions that vest Plaintiff with rights to the Intellectual Property, the court finds that this argument is not well-taken.

### (c) Court's Conclusion

The court finds that Skurka is likely to succeed on its claim for breach of contract.  The APA assigns the rights of the Intellectual Property to Skurka.

However, the court finds that Defendant's argument that the APA grants Defendant the right to make minor repairs to Plaintiff's motors upon receipt of them has merit.  In addition, the court acknowledges Defendant's concern that the quality of Skurka's products has been substandard (*E.g.*, Tr. Trans., at p. 518, 540 (Carroll Testimony) ("Q. And during your examination by Mr. Ware you categorized Skurka as a poor performer, right? A. That's correct."), p. 601 (Carroll Testimony ("Q. And does Skurka have a quality track record that would allow Eaton to diminish its level of receiving inspection, such as the skip lot or the dock to stock program you talked about? A. No. Their performance requires a lot more rigorous quality process at Eaton Grand Rapids facility.")), and Defendant's contention that source inspections should be used in conjunction with receiving inspections.  (*Id.*, at p. 493 (Ritter Testimony) ("Q. All right. Now, does that relieve in any way your

-25-

obligation to do receiving and inspection in Grand Rapids? A. No, it does not. Source inspection is done as an additional step to address poor quality performance. So it is an additional safeguard to increase the accuracy of inspection."), p. 601 (Carroll Testimony).)  As further detailed below, if Defendant does not only want to rely on source inspections, the court requires Defendant to create SCDs for motors and detailed drawings for parts with cooperation from Plaintiff.

(ii) Conversion Claim and Misappropriation of Trade Secrets

Because the court finds that Skurka is likely to succeed on the merits of its breach of contract claim, the court need not determine whether Skurka is likely to prevail on its claims for conversion and misappropriation.  *Hoover*, 77 F. App'x at 781, 784 ("We conclude that it is not necessary to reach the question of whether breach of fiduciary duty is a proper basis for injunctive relief, given our finding that as Hoover is likely to prevail on its unfair competition claim[,] for which injunctive relief is available.").

(b) Irreparable Harm to Movant

Plaintiff argues that it will suffer irreparable harm absent injunctive relief because while Eaton has Skurka's trade secrets, Skurka cannot adequately protect the trade secrets, and Eaton "can potentially share this information with third parties without Skurka's knowledge or consent." (Pl.'s Mot. for a Pre. Inj., ECF No. 43-1, at p. 30.) Plaintiff further expresses concern that Eaton will disclose its trade secrets to third parties because it has already disclosed Skurka's trade secrets to Preco and Motion Tech., two third-party companies, and has made two unauthorized disclosures to Boeing, as established at the hearing.  Skurka argues that Eaton's disclosure to Motion Tech was not simply a mistake but rather was a deliberate disclosure of Skurka's trade secrets.

Eaton argues that the disclosures were not as egregious as Skurka claimed them to be. It

-26-

maintains that disclosures to Boeing involved two email chains.  The purpose of disclosing information to Boeing was that, as the Type Certificate holder for the overall aircraft design, Boeing is responsible for that design.  (Tr. Trans., at pp. 283-84 (McSweeny Testimony), 605-06 (Carroll Testimony).)  Skurka and Boeing entered into a Non-Disclosure Agreement at Eaton's request so that Eaton would be able to share Skuka's information with Boeing.  (Tr. Trans., at pp. 175-77 (Sievers Testimony), 485-87 (Ritter Testimony).)  Eaton further presented evidence that Skurka knew that its information would be shared with Boeing.  (Tr. Trans., at pp. 608-10 (Carroll Testimony), Jt. Ex. 20 (Emails between Kevin Lindberg, Kelly Younkers, Dani Nelson, David Scheff, and Michael Ritter), at p. 2.)  Notably, Mr. Sievers testified that he had no concerns about Boeing having Skurka's intellectual property.  (Tr. Trans., at p. 758 (Sievers Testimony).)

Eaton offered testimony explaining the circumstances surrounding the disclosures to Preco and MotionTech.  It indicated that Eaton employed a consultant to investigate a problem with a motor supplied to Eaton by Skurka.  (Tr. Trans., at pp. 521-22 (Carroll Testimony).)  Eaton disclosed Skurka's information to the consultant, and the disclosures were covered by a Non-Disclosure Agreement.  (Jt. Ex. 17 (Decl. of Michael Salerno).)  When the consultant was unable to resolve the problem with the motor, Eaton created a Design Specification document to send to potential new suppliers, including Preco and MotionTech.  (Tr. Trans., at pp. 521-27 (Carroll Testimony).)  One page of this document included a top-level drawing of the exterior of the motor, which came from a Skurka drawing.  (Tr. Trans., at pp. 525-27 (Carroll Testimony).)  After discovering the disclosure, Eaton contacted MotionTech and Preco and obtained written confirmation that both had destroyed the provided information.  (Tr. Trans., at pp. 531-32 (Carroll Testimony); Jt. Ex. 17; Jt. Ex. 18.)  Two years later, the parties learned that MotionTech and Preco had retained electronic copies of the

information.  (*Id*., at p. 532.)

The court finds Plaintiff will suffer harm if a preliminary injunction is granted in favor of Defendant, or if a preliminary injunction is not granted in Plaintiff's favor, because of its inability to control its Intellectual Property.  Although Eaton has represented that the drawings have been isolated to a secure folder, this safeguard is not sufficient given Eaton's past record of disclosures, and given Skurka's contractual rights to the Intellectual Property.

### (c) Substantial Harm to Others

Skurka argues that Eaton will not suffer irreparable harm if Skurka is granted injunctive relief because the FAA does not require Eaton to possess copies of Skurka's Intellectual Property.  (Pl.'s Post-Hearing Br., ECF No. 82, at pp. 12-17.)  Eaton argues that it will be harmed if it cannot possess copies of Skurka's Intellectual Property and that source inspection would be an inadequate substitute because of the poor quality of Skurka's parts.  However, Eaton's Quality Manual allows for source inspection (Tr. Trans., at pp. 422, 540-41; J. Ex. 8 (Eaton's Supplier Quality Manual)), and Section 1.2 of the Supply Agreement requires that Eaton have "reasonable access" to design drawings, not possession (Supply Agr., § 1.2).  Furthermore, testimony of Mr. Sievers revealed that Skurka permits source inspection to other customers, such as Boeing, Honeywell, and Rolls Royce.  (Tr. Trans., at pp. 728-29.)

Therefore, Defendant has not convinced the court that it will suffer substantial harm if a preliminary injunction is ordered in favor of Plaintiff, or if Defendant's Motion for a Preliminary Injunction is denied.  Defendant has not established that the FAA's requirement to have design drawings "readily available" requires them to be in Eaton's possession at Eaton's facility in Grand Rapids, Michigan.  Further, Defendant has not shown that the FAA is likely to rescind Defendant's

PMA if it no longer has detailed design drawings on its premises. Eaton has the option of conducting source inspections. However, Eaton has maintained that source inspections are inadequate because Skurka's products have quality control problems. Therefore, if Eaton chooses not to conduct source inspections, it can still create SCDs for motors and detailed drawings for parts, as further discussed below.

(d) Public Interest

Plaintiff argues that the public interest is served by enforcement of contracts. Plaintiff further argues that Defendant's concerns over the quality of Skurka's products would best be addressed by performing source inspections. (Pl.'s Post-Hearing Br. in Support of Motion for Injunctive Relief, ECF No. 82, at p. 18 (Sealed Document).) Defendant, argues that granting its Motion for a Preliminary Injunction and denying Plaintiff's Motion for Preliminary Injunction would serve the greater public interest because not doing so would halt production because on-site inspections are not feasible or cost-effective. The court is persuaded that the public's interest in upholding contract provisions supports granting Plaintiff's Motion for Preliminary Injunction.

Therefore, the court hereby grants Plaintiff's Motion for Preliminary Injunction. (ECF No. 43-1.)

### 3. Application of Standard for Preliminary Injunction to Defendant's Counterclaims

(a) Substantial Likelihood of Success on the Merits

Eaton's counterclaim sets forth two claims relating to Skurka's refusal to provide updated design drawings: Count IV states that Skurka's conduct breaches the Supply Agreement, and Count VI asks the court to issue a declaratory judgment that Eaton is entitled to retain copies of design drawings and related documents. Eaton argues that it is likely to succeed on its claims because it

-29-

must retain copies of the design drawings in order to comply with FAA regulations, inspect products, approve design changes, and make minor repairs.  Eaton further argues that Skurka is breaching the express terms of the Supply Agreement each time it withholds design drawings when it submits DCN forms.  The court has already determined that Skurka is likely to succeed on the merits of its breach of contract claim, and as a result, Eaton is not likely to succeed on its claims.  Eaton has not demonstrated that it needs the detailed design drawings in order to conduct proper inspections.

However, Eaton has successfully argued that the FAA requires that drawings be "readily available" and that source inspections would be costly, timely, and would not sufficiently account for Skurka's high rate of errors.  In this regard, witnesses testified that a compromise option of using SCDs exists.  The situation between Skurka and Eaton is unique in that Eaton originally owned the Intellectual Property that Skurka now owns.  (Trial Trans., at p. 431 (Ritter Testimony) ("Q. You would agree that the situation of Eaton selling the IP or for parts that Eaton now purchases is unique? A. It is a fairly unique situation, yes.").)  Nonetheless, in all other situations where suppliers owns their Intellectual Property, Eaton and the suppliers have SCDs in place.  (*Id.* at 430 (Ritter Testimony) ("A. I believe in all of those situations with respect -- except for Skurka we have an SCD in place.").)  There is no other situation where Eaton holds onto the supplier's Intellectual Property. (*Id.* at p. 431 (Ritter Testimony) ("Q. And you don't know of any other situation where Eaton possesses the detail design drawings of a supplier, right? A. I do not know of any.").)

Eaton's witnesses agreed that they could work with SCDs to inspect the motors but that the process of creating the SCDs would require collaboration from Skurka.  (Trial Trans., at pp. 325 (McSweeny Testimony); *see also* Ritter Testimony at p. 385 ("Q. Okay. Could you get to the point where you could substitute SCDs for the motor drawings? A. From a receiving inspection

-30-

perspective, that would be acceptable.").)  The collaboration needed is that Skurka would have to agree to make its products in conformance with the SCDs and would have to provide revision control for those documents (*Id*. at p. 432 (Ritter Testimony).)

SCDs cannot necessarily be used to inspect piece parts.  (*Id*. at 243 (Dreikorn Testimony) ("Q. Now, if you're inspecting a component part of a motor, so now we're not talking about the entire motor, we're talking about piece part, you would need to have a drawing or the technical data applicable to that component in order to do that inspection? A. I would never ask an inspector to inspect without the appropriate standard. So the answer is correct.").)  In order to be able to conduct receiving inspections of piece parts, Eaton needs drawings or technical data applicable to the piece parts.  (*Id*.)

Currently, Eaton receives about 30 motors and 1,600  piece parts from Skurka.  (*Id*. at p. 388 (Ritter Testimony).)  Without knowing which drawings Eaton currently has on its system, it is impossible to know exactly how long it would take Eaton to create SCDs for the motors and drawings for the piece parts.  Nonetheless, it appears that this is the best option for the parties to pursue in order to continue their business relationship.

### (b) Irreparable Harm to Movant

Eaton argues that it will suffer irreparable harm because: (1) Eaton would be out of compliance with FAA regulations; (2) Eaton would violate supply agreements with its customers and would interrupt the supply of necessary components to aerospace manufacturers and airlines; and (3) Skurka's requested injunction would effectively nullify the Supply Agreement.

Without copies of the engineering drawings, Eaton argues that it will not be able to inspect the products it buys from Skurka, make repairs, and certify the products as airworthy.  Eaton further

argues that source inspection, which Skurka proposes, does not conform with Eaton's FAA-approved Fabrication Inspection System.  Mr. Carroll testified that source inspection is employed as an extra measure of inspection, not as an alternative to a receiving inspection.  (Tr. Trans., at pp. 502-04 (Carroll Testimony); *see also* Tr. Trans., at p. 493 (Ritter Testimony).) Eaton further argues that traveling from Michigan to California to inspect the parts and motions would result in unreasonable delays and expenses.

However, McSweeny testified that if Eaton had SCDs, it would be able to complete its inspections.  Therefore, the court finds that so long as Eaton has SCDs for the motors and detailed drawings for the parts Skurka ships, it does not need the detailed design drawings in order to comply with FAA requirements, and Defendant will not suffer irreparable harm if its Motion is denied.

### (c) Substantial Harm to Others

As articulated above, Skurka argued that Eaton's past disclosures to third parties indicate that future disclosures are possible.  The court finds that this would cause substantial harm to Skurka. Eaton confirmed in its discovery responses that it had disclosed a limited amount of Intellectual Property to two third parties in 2007.   (Def.'s Combined Memo. in Opp. to Pl.'s Mot. for Inj., and in Supp. of its Cross-Mot. for Pre. Inj., ECF No. 52, at p. 28, citing Answers to Interrogatory No. 4 and Request for Admission No. 4.)  Although Eaton states that it has addressed the past disclosures and it has already placed Skurka's drawings in a secure folder, the harm that Skurka could suffer results in this prong falling in Skurka's favor.

### (d) Public Interest

The public interest favors Eaton's diligent inspection of motors and components before they are used in door assemblies and installed in commercial and military aircraft.  However, the court

disagrees with Eaton's categorization of this situation.  Eaton argues that an injunction In Plaintiff's favor would force Eaton to choose between violating FAA regulations and risking its PMA status on the one hand, and halting all production, repair, and maintenance of door assemblies on the other. (Def.'s Combined Memo. in Opp. to Pl.'s Mot. for Inj., and in Supp. of its Cross-Mot. for Preliminary Inj., ECF No. 52, at p. 26.)  The court does not find that requiring Eaton to abide by the APA and permit Skurka to retain all of its Intellectual Property would necessarily violate FAA regulations or risk Eaton's PMA status.  Instead, as discussed above, the public's interest in enforcing contract provisions weighs in favor of granting Skurka's Motion for a Preliminary Injunction and denying Eaton's Motion for a Preliminary Injunction.

## IV.  CONCLUSION

Therefore, the court hereby grants in part and denies in part Plaintiff's Motion for a Preliminary Injunction (ECF No. 43-1) and denies Defendant's Motion for Preliminary Injunction (ECF No. 50.)

(1)     The court notes that source inspections are a possible method of inspecting motors and parts. However, in light of Skurka's high error rate, the court finds that receiving inspections with access by Eaton to SCDs and other appropriate drawings is preferable, so long as Eaton proceeds in good faith to create the necessary documents.

(2)     Eaton must immediately begin creating SCDs for motors, and Skurka must collaborate with Eaton on this endeavor.  Eaton must immediately begin creating drawings or other technical data for piece parts only to the extent necessary to inspect them, and Skurka must also collaborate with Eaton on this endeavor.  Skurka must agree to make its products in conformance with the SCDs and must provide revision control for those documents.

(3)     In the meantime, Eaton must identify all of the Intellectual Property of Skurka's that it still retains.  Eaton must provide Skurka with full access to its Intellectual Property.

(4)     Eaton shall provide a system that controls access to the Intellectual Property only to those necessary.

(5)     Eaton shall not provide the Intellectual Property to others without Skurka's approval.  Eaton shall not use the Intellectual Property for purposes of other bids and shall not reveal the Intellectual Property to Skurka's competitors.

(6)     Eaton must report to the court within 60 days of this Order regarding its progress with creating SCDs and drawings or other technical data needed to inspect the motors and parts, at which time the court will decide the time frame for the full turnover of Skurka's Intellectual Property from Eaton to Skurka.

IT IS SO ORDERED.

/S/ SOLOMON OLIVER, JR.
CHIEF JUDGE
UNITED STATES DISTRICT COURT

March 18, 2011

-34-