UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SKURKA AEROSPACE, INC., | ) | Case No.: 1:08 CV 1565 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| EATON AEROSPACE, L.L.C., | ) | |
| | ) | |
| Defendant | ) | <u>ORDER</u> |

Currently pending in the above-captioned case is Plaintiff Skurka Aerospace, Inc.'s ("Skurka" or "Plaintiff") Motion to Dismiss Counts IV and VI of the Amended Counterclaim (ECF No. 49).   For the following reasons, the court denies Plaintiff's Motion.

## I. FACTS AND PROCEDURAL HISTORY

The parties entered into an Asset Purchase Agreement on June 30, 2005, under which Skurka acquired substantially all of the assets of an Eaton division.  The parties also entered into the Supply Agreement, which required Eaton to purchase certain specific motor products exclusively from Skurka from June 30, 2005, through June 30, 2012. Skurka alleges various claims arising out of these contracts.

Eaton filed a Counterclaim with its Answer on September 2, 2008 (ECF No. 7).  Eaton filed an Amended Counterclaim on September 21, 2009 (ECF No. 42). The two counterclaims that Skurka argues should be dismissed are Counts IV and VI.  Count IV alleges that Skurka

breached the Supply Agreement by not providing drawings and information to Eaton. (Def.'s Am. Counterclaim, ECF No. 42, at pp. 29-31.) In Count VI, Eaton alleges that it is entitled to a declaratory judgment that it has the right to retain drawings and information. The court permitted Eaton to file a Second Amended Counterclaim on February 18, 2011 (Order, ECF No. 151), which added two new counterclaims. As the Second Amended Counterclaim does not change the allegations in Counts IV and VI of the Amended Counterclaim, however, the court proceeds with Plaintiff's Motion to Dismiss Counts IV and VI of the Amended Counterclaim.

## II. LEGAL STANDARD FOR A MOTION TO DISMISS

The court examines the legal sufficiency of the plaintiff's claim under Federal Rule of Civil Procedure 12(b)(6). *See Mayer v. Mulod*, 988 F.2d 635, 638 (6th Cir. 1993). The Supreme Court in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) and recently in *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949-50 (2009) clarified the law regarding what the plaintiff must plead in order to survive a Rule 12(b)(6) motion.

When determining whether the plaintiff has stated a claim upon which relief can be granted, the court must construe the Complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the Complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. The plaintiff's obligation to provide the grounds for relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. Even though a Complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the

assumption that all the allegations in the Complaint are true." *Id.* A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

The Court in *Iqbal*, 129 S.Ct. at 1949, further explains the "plausibility" requirement, stating that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Furthermore, "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant acted unlawfully." *Id.* This determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950.

The Sixth Circuit has held that a court may consider allegations contained in the Complaint, as well as exhibits attached to or otherwise incorporated in the Complaint, all without converting a Motion to Dismiss to a Motion for Summary Judgment. Fed. R. Civ. P. 10(c); *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997).

### III. LAW AND ANALYSIS

#### A.  Breach of Contract

Count IV of Eaton's Second Amended Counterclaim maintains that it should have access to the Intellectual Property at issue based on Section 1.1 of the Supply Agreement. Section 1.1 states:

> During the term of this Supply Agreement and subject to Section 1.2 hereof, Supplier shall sell and deliver to Eaton and Eaton shall purchase exclusively from Supplier, all quantities of Products (as hereinafter defined) as Eaton shall require from time to time . . . . "Products" shall mean the aerospace motors, motor subassemblies and motor components incorporating the Intellectual Property included in the

-3-

>> Transferred Assets, but excluding those items set forth on Appendix A hereto.

The above-referenced "Intellectual Property included in the Transferred Assets" refers to the Intellectual Property Skurka acquired from Eaton in connection with Skurka's purchase of an Eaton division pursuant to an Asset Purchase Agreement ("APA") the parties entered into the same day as the Supply Agreement.

### 1. Breach of Express Contractual Terms

This issue involves a difference in opinion regarding the interpretation of the word "incorporating" in Section 1.1 of the Supply Agreement. Skurka maintains that the Products which must be supplied to Eaton are motors and motor components that are made from Intellectual Property. (Pl.'s Memo. in Supp. of its Mot. to Dismiss Counts IV and VI of the Am. Counterclaim, ECF No. 49-1, at p. 3.) Eaton maintains that these Products include Intellectual Property, such as the designs, drawings, and specifications that relate to the Products.

As a general rule, "interpretation of written contract terms is a matter of law for initial determination by the court." *Constr. Interior Sys., Inc. v. Marriott Family Rests., Inc.*, 984 F.2d 749, 754 (6th Cir. 1993); *see also Potti v. Duramed Pharmaceuticals, Inc.*, 938 F.2d 641, 647 (6th Cir. 1991). However, "when the relevant contract language is ambiguous . . . the job of interpretation is turned over to the fact finder, . . . and the determination whether a contract is ambiguous is made as a matter of law by the court." *Id.* (citation omitted); *see also Contruction Interior Sys., Inc. v. Marriott Family*, 984 F.3d 749, 754 (6th Cir. 1993) (same).

Skurka argues that, "Count IV of the Amended Counterclaim fails as a matter of law because Eaton has not adequately alleged the existence of a binding contract requiring Skurka

-4-

to provide Eaton with, and permitting Eaton to retain, Skurka's Intellectual Property." (*Id.*, at p. 7.) First, Skurka maintains that Eaton misquoted Section 1.1 by substituting the word "including" for "incorporating." Second, Skurka argues that this alleged duty conflicts with other express language in the contract. Third, Skurka further maintains that Eaton cannot claim that Skurka violated the duty of good faith and fair dealing because the implied covenant of good faith and fair dealing cannot create new obligations under the Supply Agreement.

In response, Eaton argues that it has properly plead a claim for breach of contract under the Supply Agreement because the express terms of the Supply Agreement require Skurka to provide design drawings to Eaton. Eaton argues that, "[p]ursuant to Section 1.1 of the Supply Agreement, the term 'Products' includes 'the Intellectual Property included in the Transferred Assets.'" (Am. Counterclaim, ECF No. 42, ¶¶ 61, 79.) Eaton takes issue with Skurka's argument that the word "incorporate" can only mean "are made from" and cannot mean "include." Eaton argues that the meaning of "incorporate" is not clear and unambiguous because it "is susceptible to two or more reasonable interpretations." (Def.'s Memo. in Opp. to Pl.'s Mot. to Dismiss Counts IV and VI of the Am. Counterclaim, ECF No. 64, at p. 12, citing *Potti v. Duramed Pharmaceuticals, Inc.*, 938 F.2d 641, 647 (6th Cir. 1991)). Eaton relies on Merriam-Webster's Dictionary of Law to define "incorporate" and states that as a transitive verb, it can mean "to include." Eaton further relies on the Asset Purchase Agreement, which defines "Intellectual Property" as including designs, drawings, and specifications. (APA, ECF No. 1-1, Art. 1, at p. 4.)

There are sections in the Supply Agreement that support Skurka's reading of the term "incorporating." Section 1.5 states: "*Intellectual Property Rights.* Subject to Section 3.3(d),

-5-

all intellectual property rights to the Products are owned by and shall remain with [Skurka]." Section 3.3(d) of the Supply Agreement requires that, in the event of a delivery delay, Skurka "shall provide Eaton reasonable access to [Skurka's] intellectual property . . . for the manufacture of those Products (and only those Products), potentially by another source or by Eaton solely for the duration of Supplier's inability or unwillingness to perform." Finally, Section 1.2(b) of the Supply Agreement states: "[i]f required by applicable law or governmental regulation, Supplier shall provide Eaton reasonable access to all manufacturing and inspection records for the applicable Products."

Therefore, the question is whether, in light of Sections 1.2(b), 1.5, and 3.3(d) of the Supply Agreement, the term "incorporating" is ambiguous. The court finds that it is not. First, "[a] word is not ambiguous merely because different dictionary definitions exist." *AGK Holdings, Inc. v. Essex Ins. Co.*, 142 F. App'x 889, 892 (6th Cir. 2005); *see also Equitable Life Assur. Soc'y of U.S. v. Poe*, 143 F.3d 1013, 1016 (6th Cir. 1998) ("Mere disagreement among parties as to the meaning of [contract] terms does not constitute ambiguity."); *Westport Ins. Corp. v. Coffman*, No. C2-05-1152, 2009 WL 243096, at *5 (S.D. Ohio Jan. 29, 2009) ("[M]ultiple or broad meanings do not necessarily create ambiguity.").

Second, Eaton's interpretation of "incorporating" directly conflicts with express terms of the Supply Agreement. Where "the interpretation urged by one party is unreasonable in light of the contract's plain language, the contract is not ambiguous." *Novoneuron, Inc. v. Addiction Research Institute, Inc.*, 326 F. App'x 505, 508 (11th Cir. 2009). Section 1.5 establishes that Skurka has exclusive ownership of the Intellectual Property, and Sections 1.2(b) and 3.3(d) delineate circumstances in which Eaton could have access to the Intellectual

Property.  Reading the word "incorporating" in Section 1.1 of the Supply Agreement to mean "including" would directly conflict with the plain language of these other sections.

Therefore, the court finds that Eaton did not state a claim for breach of an express term of a contract because language in the Supply Agreement is directly contrary to Eaton's claim. However, it is still possible that Eaton properly pled a breach of an implied contractual term. The court now turns to Eaton's arguments in this regard.

### 2.  Breach of Implied Contractual Terms

Eaton further argues that Skurka's obligation to provide copies of design drawings to Eaton stems from implied terms in the contract. Eaton proposes four sources of this implied term. The first source of this implied term is FAA regulations. The second source of the implied term is the parties' course of performance. The third source of the implied term is that Eaton would be unable to exercise its express rights under the Supply Agreement without possessing and using copies of the design drawings. The fourth source is that Skurka is violating its duty of good faith and fair dealing by withholding updated design drawings.

Skurka maintains that none of the proposed implied terms can exist because "[i]t is well established that a court cannot add an implied contract term that is inconsistent with an express contract." *TVA v. Exxon Nuclear Co., Inc.*, 753 F.2d 493, 497 (6th Cir. 1985). The court agrees with this statement of law but must analyze each proposed implied right to determine if it directly conflicts with express language in the contract in order to determine whether Eaton sufficiently pled an implied right to access to some of the Intellectual Property.

### a.  FAA Regulations

Eaton argues that FAA regulations should be treated as implied terms of the Supply Agreement because, in Ohio, "'existing laws [are] read into contracts in order to fix the obligations between the parties.'" *Gibson v. Meadow Gold Dairy*, 88 Ohio St. 3d 201, 204 (2000) (quoting *Middletown v. Ferguson* (1986), 495 N.E.2d 380, 387 (Ohio 1986)); *see also Macula v. Lawyers Title Ins. Corp.*, No. 1:07-CV-1545, 2008 U.S. Dist. LEXIS 90468, at *10 (N.D. Ohio Aug. 14, 2008) ("[I]n Ohio, an inferred term of every contract is that it adheres to the applicable law."). Eaton alleged in its Counterclaim that FAA Regulation 14 C.F.R. § 21.303(h)(6) requires the design drawings to be "readily available" at Eaton's facility. (Sec. Am. Counterclaim, ¶ 11.)

Skurka's objection to this argument is that existing laws cannot be read into contracts where the contract clearly evidences a contrary intent. (Pl.'s Reply Brief, ECF No. 70, at p. 9, citing *Eastwood Local Sch. Dist. Bd. of Educ. v. Eastwood Educ. Ass'n*, 875 N.E.2d 139, 143 (Ohio Ct. App. 2007).) The court finds that the "reasonable access" language in the Supply Agreement could mean that Eaton is entitled to view certain Intellectual Property at its facility. As previously discussed, Section 1.2(b) of the Supply Agreement states: "[i]f required by applicable law or governmental regulation, Supplier shall provide Eaton reasonable access to all manufacturing and inspection records for the applicable Products." It is possible that "manufacturing and inspection records" could include Intellectual Property. If so, Eaton's claim that it has the right to receive copies of Intellectual Property from Skurka for the purposes of inspections does not directly conflict with Section 1.5.

Therefore, although the court, in its Order on Motions for Preliminary Injunction (ECF No. 161), determined that Eaton is unlikely to succeed on its argument that FAA Regulations

-8-

require Eaton to possess the Intellectual Property at issue in this case, Eaton still adequately pled this claim in its Complaint, and it is possible that Eaton will be able to show that it should have temporary or limited possession or access to some Intellectual Property in order to comply with federal regulations.

### b. Course of Performance

Eaton alleges that Skurka repeatedly delivered copies of design drawings to Eaton even after it had instituted this litigation against Eaton. (Sec. Am. Counterclaim, ECF No. 108-1, ¶ 79 ("Prior to filing its Complaint in this Action, Skurka routinely provided drawings of the Products and drawings of the proposed change(s) with its DCNs.").) Eaton therefore maintains that this created a course of performance that alters the terms of the Supply Agreement and requires Skurka to provide Intellectual Property to Eaton. Ohio law and Sixth Circuit jurisprudence show that course of performance is an accepted method of contract interpretation. O.R.C. 1302.11(A) ("... any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement."); *Lancaster Glass Corp. v. Philips ECG, Inc.*, 835 F.2d 652, 659 (6th Cir. 1987) (finding that a course of performance had been established between the two parties).

The court determined the following in its Order on the Motions for Preliminary Injunction (ECF No. 161):

> Eaton argues that Skurka's conduct in sending drawings to Eaton without demanding that Eaton destroy the drawings, and in failing to object to Eaton's possession and use of copies of the drawings, created a course of performance that is incorporated into the APA and the Supply Agreement. Peter Foote of Eaton testified that Skurka provided Eaton with updated design drawings when Skurka submitted a design change for approval; this occurred more than 1,100 times over the course of four years. (Tr. Trans., at pp. 679-82 (Foote

Testimony).) Mr. Ritter of Eaton confirmed that Skurka knew that Eaton was retaining Skurka's drawings on its database. (Tr. Trans., at pp. 416-17 (Ritter Testimony).) Mr. Sievers, Skurka's current President, admitted that after seeing certain emails between employees at Skurka and employees at Eaton, he agrees that Skurka knew that Eaton was in possession of Skurka's drawings. (Tr. Trans., at pp. 153-54 (Sievers Testimony).)

The APA states that, "[n]o waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of such provision at any time in the future or a waiver of any other provision hereof." (APA, § 19.2.) Section 4.8 of the Supply Agreement states:

> The provisions of this Supply Agreement may be waived, altered, amended or repealed in whole or in part only upon the written consent of Eaton and [Skurka]. The waiver by either Party of any breach of this Supply Agreement shall not be deemed or construed as a waiver of any other breach, whether prior, subsequent or contemporaneous, of this Supply Agreement.

Anti-waiver provisions prevent a course of performance from changing a party's future rights pursuant to a contract. E.g., Ed Wolf, Inc. v. National City Bank, Cleveland, 1997 WL 25524, *7 (Ohio App. 8 Dist., Jan. 23, 1997) ("Past acceptance of late payments does not constitute a waiver of the creditor's right to accelerate on a loan following a subsequent default where the loan document contains an anti-waiver provision."); *Metropolitan Life Ins. Co. v. Triskett Illinois, Inc.*, 646 N.E.2d 528, 532 (Ohio App. 1 Dist. Sept. 21, 1994) ("Metlife's acceptance of Triskett's February 28, 1991 . . . cannot be construed to constitute a waiver of Triskett's September 1990 through March 1991 defaults when the mortgage expressly provided that a "waiver * * * of any * * * default * * * shall [not] be deemed or construed to be a * * * waiver * * * of any other * * * default in the performance of the * * * obligations of" Triskett under the mortgage."); *Gaul v. Olympia Fitness Center, Inc.*, 623 N.E.2d 1281, 1286 (Ohio App. 8 Dist., June 21, 1993) ("It has been consistently held that a mortgagee's past acceptance of late loan payments does not constitute a waiver of the mortgagee's right to accelerate and foreclose on a loan following a subsequent default where the relevant loan documents contain "anti-waiver" provisions similar to those in the loan documents in this case."). In addition, Mr. Foote, of Eaton, on cross-examination, admitted that he did not believe that Skurka modified or changed the terms of the agreements through its limited sharing of Intellectual Property.

> (Tr. Trans., at pp. 709-10.) Therefore, the court finds that Defendant's course of performance argument is not well-taken.

The court acknowledges that it is required to apply a different legal standard to a motion for a preliminary injunction than to a motion to dismiss. However, the case law quoted above reveals that a course of performance cannot override an anti-waiver provision. Thus, because of the anti-waiver provision in the APA and Section 4.8 of the Supply Agreement, the court finds that this alternative breach of contract theory does not withstand Plaintiff's Rule 12(b)(6) Motion to Dismiss.

### c. Inability to Exercise Express Contractual Rights

Eaton argues that because the Supply Agreement authorizes Eaton to inspect Skurka products, make minor repairs to motors, and approve proposed changes to the products, the contract implicitly permits Eaton to utilize design drawings at its facility to perform these inspections. Therefore, Eaton alleges that Skurka should provide design drawings to Eaton, pursuant to the requirement to act in good faith. Skurka responds that this alleged implied term is contrary to Section 1.5 of the Supply Agreement, which states that "all intellectual property rights to the Products are owned by and shall remain with [Skurka]." Section 1.2(b) of the Supply Agreement carves out an exception by stating, "[i]f required by applicable law or governmental regulation, [Skurka] shall provide Eaton reasonable access to all manufacturing and inspection records for the applicable Products."

Eaton's claim that Skurka breached the Supply Agreement by not providing Eaton with certain Intellectual Property is not incompatible with Section 1.5. Although Skurka has exclusive rights over the Intellectual Property, it is possible that the parties contracted in Section 1.2 of the Supply Agreement to permit Eaton access to the drawings at its facility.

-11-

Although the court determined in its Order on the Motions for Preliminary Injunction (ECF No. 161), that Eaton is not likely to prevail on this argument, it did not rule out the possibility of Eaton prevailing on this issue once it had completed discovery on this issue. Eaton has adequately pled a claim for relief.

### d. Good Faith and Fair Dealing

Eaton alleges in its Counterclaim that the duty of good faith and fair dealing requires Skurka to provide drawings to Eaton. (Sec. Am. Counterclaim, ECF No. 108-1, ¶ 78 ("Pursuant to the duty of good faith and fair dealing that is implicit in every Ohio contract, Skurka has a duty to provide drawings of the Products and drawings of proposed change(s) when it submits DCNs to Eaton, and to permit Eaton to retain those drawings in compliance with legal regulations.") In response, Skurka argues that this alleged implied term conflicts with express contractual obligations, and as a result, there cannot be an implied duty. Good faith "refers to 'an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties.'" *Savedoff v. Access Group, Inc.*, 524 F.3d 724, 764 (6th Cir. 2008) (citation omitted). In support of its claim, Eaton alleges that Skurka knew that Eaton had long-term agreements to supply the airline industry with motors and parts and that the Supply Agreement is an exclusive requirements contract. Eaton argues that Skurka has a duty not to interfere with Eaton's ability to comply with these long-term agreements.

A claim for breach of good faith and fair dealing is not an independent claim under Ohio law, but rather "is part of a contract claim." *Wauseon Plaza Ltd. v. Wauseon Hardware Co.*, 807 N.E.2d 953, 962 (Ohio App. 6 Dist. 2004) (citation omitted); *see also Firelands Reg'l*

*Med. Center v. Jeavons*, 2008 WL 4408600 ¶ 28 (Ohio App. 6 Dist. Sept. 30, 2008) ("[A] claim for breach of contract subsumes the accompanying claim for breach of the duty of good faith and fair dealing[.]") (citation omitted).  The court finds that Eaton has at least pled a colorable claim for a breach of the implied duty of good faith and fair dealing and therefore denies Plaintiff's Motion to Dismiss in this regard.

### 3. Claim for Declaratory Judgment

The Declaratory Judgment Act provides that, "[i]n case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).  Because the court found above that Eaton's claim for breach of contract can withstand a Rule 12(b)(6) Motion to Dismiss, the court finds that Eaton's claim for Declaratory Judgment remains.

### IV.  CONCLUSION

For the foregoing reasons, the court denies Plaintiff's Motion to Dismiss Counts IV and VI of Defendant's Counterclaim (ECF No. 49).  Although the court finds that Defendant cannot pursue all of its theories for breach of contract, its claim for breach of implied contract terms based on FAA Regulations, the right to perform inspections, and the duty of good faith and fair dealing all withstand Rule 12(b)(6) scrutiny.

IT IS SO ORDERED.

/S/ SOLOMON OLIVER, JR.
CHIEF JUDGE
UNITED STATES DISTRICT COURT

March 26, 2011