UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SKURKA AEROSPACE, INC., | ) | Case No.: 1:08 CV 1565 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| EATON AEROSPACE, L.L.C., | ) | |
| | ) | |
| Defendant | ) | ORDER |

Currently pending in the above-captioned case between Plaintiff Skurka Aerospace, Inc. ("Skurka" or "Plaintiff") and Defendant Eaton Aerospace, L.L.C. ("Eaton" or "Defendant") is Plaintiff's Motion for Partial Summary Judgment (ECF No. 45). For the following reasons, the court denies Plaintiff's Motion.

## I. FACTS AND PROCEDURAL HISTORY

The parties entered into an Asset Purchase Agreement ("APA") on June 30, 2005, under which Skurka acquired substantially all of the assets of an Eaton division. The parties also entered into a Supply Agreement, which required Eaton to purchase certain specific motor products exclusively from Skurka from June 30, 2005, through June 30, 2012. Skurka alleges various claims arising out of these contracts. At issue in the present Motion are Count I, in which Skurka alleges that Eaton breached the Supply Agreement "by incorrectly submitting [Original Equipment Manufacturer ("OEM")] pricing in purchase orders for Products that were not for airframe

production but instead were for spare parts, replacement parts or cargo conversions," and Count II, in which Skurka makes a claim for declaratory judgment. (Sec. Am. Compl., ECF No. 37.)

This case arises out of the question of whether products used in a cargo conversion constitutes an Original Equipment Manufacturer ("OEM") application or an aftermarket application. A "cargo conversion" is not defined in the Supply Agreement. It is understood to be the process of changing a passenger airplane to an airplane capable of transporting cargo. (Def.'s Opp. to Pl.'s Mot. for Partial Summ. Judg., ECF No. 61, at p. 7.) If products used in cargo conversions constitute an OEM process, then the price of these products is less than if the products used in cargo conversions constitute aftermarket applications. Skurka maintains that products used in a cargo conversion should be considered products used in aftermarket production. Eaton maintains that the products were being used for an OEM application because by altering the airplane from a passenger jet to a cargo plane, the products created a new aircraft altogether. Therefore, the question before the court is whether the Supply Agreement's language on its face states that a cargo conversion is an aftermarket application rather than an OEM application. If so, then summary judgment can be granted in Plaintiff's favor. If not, then there remains a genuine issue of material fact as to how to classify products used in a cargo conversion.

Section 1.3 of the Supply Agreement states:

> The prices for aftermarket motors and components are as set forth on Appendix B. The prices for OEM airframe production requirements to be delivered under this Agreement are equal to Supplier's standard costs for 2005, and for each year after 2005, prices will be adjusted upward in accordance with any increase in the index set forth on Appendix C.

Skurka argues that this court should find as a matter of law that Skurka is entitled to be paid the aftermarket contract price for all motors used as aftermarket spare parts, in repairs, and in cargo conversions.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

In reviewing summary judgment motions, this court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id*. at 252. However, "[c]redibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment." *Ahlers v. Scheibil*, 188 F.3d 365, 369 (6th Cir. 1999).

The moving party has the burden of production to make a prima facie showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). If the burden of persuasion at trial would be on the moving party, as it is in this case, then the moving party

"must support its motion with credible evidence-using any of the materials specified in Rule 56(c)-that would entitle it to a directed verdict if not controverted at trial." *Id*. If such an affirmative showing is made, then it "shifts the burden of production to the party opposing the motion and requires that party either to produce evidentiary materials that demonstrate the existence of a 'genuine issue' for trial or to submit an affidavit requesting additional time for discovery." *Id*. (citations omitted).

If the moving party meets its burden of production, then the non-moving party is under an affirmative duty to point out specific facts in the record which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show "more than a scintilla of evidence to overcome summary judgment"; it is not enough to show that there is slight doubt as to material facts. *Id*. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed. R. Civ. P. 56(e).

### III. LAW AND ANALYSIS

### A. Contract Interpretation Guidelines

Words in contracts are to "be given their ordinary meaning unless manifest absurdity results, or some other meaning is clearly evidenced from the face or overall contents of the instrument." *Kena Props., LLC v. Merchs. Bank & Trust*, 218 F. App'x 402, 405 (6th Cir. 2007) (citations omitted); *see also GenCorp, Inc. v. American Intern. Underwriters*, 178 F.3d 804, 817-18 (6th Cir. 1999) ("[I]f the meaning of the contract is apparent, the terms of the agreement are to be applied, not interpreted") (citation omitted).  However, contract language can be ambiguous. Whether a contract is ambiguous is a question of law for the court.  *GenCorp*, 178 F.3d at 818; *Potti v. Duramed Pharm., Inc.*, 938 F.2d 641, 647 (6th Cir. 1991).  Language is ambiguous if "a term cannot be determined from the four corners of the agreement or where contract language is susceptible to two or more reasonable interpretations."  *Potti*, 938 F.2d at 647.  As the Sixth Circuit in *GenCorp*, 178 F.3d at 818, explained, "[a]mbiguities may be patent or latent. A latent ambiguity arises when language is clear on its face, but some intrinsic fact or extraneous evidence gives rise to two or more possible meanings."  If a contract is unclear or ambiguous, then extrinsic evidence is admissible.  *GenCorp*, 178 F.3d at 818 (citing *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (1996); *Shifrin v. Forest City Ent., Inc.*, 597 N.E.2d 499, 501 (1992)).

If a latent ambiguity exists, then summary judgment must be denied.  *Calvitti v. Anthony & Sylvan Pools Corp.*, 351 F. App'x 651, 656-57 (3d Cir. 2009) (quoting *Smith v. Hartford Ins. Group*, 6 F.3d 131, 138-39 (3d Cir.1993)) ("[A] latent ambiguity in the contract . . . is a basis upon which to deny summary judgment.").  When a latent ambiguity exists, interpretation of the affected contract provisions must be decided by a jury.  *GenCorp*, 178 F.3d at 818 ("If the court

determines that a contract term is ambiguous, a question of fact for the jury arises."); *Reed v. Proprietors of Locks & Canals on Merrimac River*, 49 U.S. 274, 290 (1850) ("The difficulty in the application of the descriptive portion of a deed to external objects, usually arises from what is called a latent ambiguity, which has its origin in parol testimony, and must necessarily be solved in the same way. It therefore becomes a question to be decided by a jury, what was the intention of the parties to the deed.")

### B. Analysis

Skurka argues that the Supply Agreement outlines a two-tier pricing structure, a lower price for products used in OEM and a higher price for products used in aftermarket applications. Eaton argues that there are three price options: (1) OEM; (2) aftermarket; and (3) new use. (Def.'s Opp. to Pl.'s Mot. for Partial Summ. Judg., ECF No. 61, at p. 5 ("In addition to these two recognized scenarios, the parties to the Supply Agreement acknowledged that new uses are sometimes made of existing motors. In those cases, the pricing can vary from OEM or aftermarket prices, and might be negotiated on their own basis.").)

Eaton explains that Paragraph C to Appendix B of the Supply Agreement states, "Supplier and Eaton will in good faith negotiate for new applications for the Products." (Supply Agr., Appx. B.) Eaton argues that cargo conversions either constitute OEM or a "new use" because "[t]o the extent that Skurka claims it did not know of the cargo conversion projects when the sale of the business closed, and that these transactions were not in mind when the Supply Agreement was drafted and executed, the Supply Agreement provides the mechanism for how pricing is to be handled." (Def.'s Opp. to Pl.'s Mot. for Partial Summ. Judg., ECF No. 61, at p. 9.)

Terms that are at issue are: (1) Original Equipment Manufacturer; (2) aftermarket use; and (3) cargo conversion. Skurka cites Merriam-Webster's Collegiate Dictionary (11th ed. 2003)'s definitions of the above terms. According to Skurka and that dictionary, Original Equipment Manufacturer is defined as "one that produces complex equipment ... from components usually bought from other manufacturers." Aftermarket is defined as "the market for parts and accessories used in the repair or enhancement of a product ...". As Skurka states in its Motion, "[c]argo conversion is defined by Eaton to be the retrofitting of an existing passenger aircraft for a different use by, among other things, adding original equipment doors, assemblies and motors." (Pl.'s Memo. in Supp. of Mot. for Partial Summ. Judg., ECF No. 45-1, at p. 2, citing Def.'s Am. Ans., ECF No. 42, at ¶ 44.) The fact that the Supply Agreement does not define the terms itself does not mean that the terms are ambiguous. *State, ex rel. Petro v. R.J. Reynolds Co.*, 104 Ohio St. 3d 559. 564 (2004) ("The fact that the parties fail to specifically define a term within the contract does not make the term ambiguous.") Skurka therefore argues that the definitions of the terms are not ambiguous and that the plain definitions of the terms reveal that cargo conversions constitute aftermarket uses.

Eaton, on the other hand, argues that a latent ambiguity exists. Eaton maintains that although the definition of cargo conversion, OEM, and aftermarket, have clear meanings, the application of these terms to the present issue - whether cargo conversions are OEM or aftermarket - creates a latent ambiguity. Because Eaton argues that a latent ambiguity exists, Eaton presents extrinsic evidence in support of its argument that a cargo conversion either is an OEM use or a new use, not an aftermarket use. Steven Parker, a former Business Development Manager at Eaton, stated in a Declaration that.

> [d]uring the negotiation of the sale of the Burbank motor business in 2005, Skurka and Eaton acknowledged that new uses are sometimes made of existing motors. In those cases, the pricing can vary from OEM or aftermarket prices, and might be negotiated on their own basis. Those new prices can be akin to OEM prices, or aftermarket prices, or something different altogether.

(Parker Decl., ECF No. 61-1, ¶ 4.) Parker went on to state that, "Eaton certainly did not intend to pay Skurka aftermarket prices - which are four to eight times higher than OEM prices - for Products used in cargo door actuation assemblies it then sold to customers at OEM prices." (*Id.*, ¶ 8.) Richard Ibarra, a Contracts Manager at Eaton, explained how Eaton classifies motors as OEM or aftermarket. (Ibarra Decl., ECF No. 61-2.) He also stated that, "[i]n Spring of 2005, Eaton had some orders for actuators and door assemblies to be used in cargo conversions on its books. Eaton classified those orders as OEM, not aftermarket." (*Id.*, ¶ 9.) In addition, Ibarra stated that, "[c]argo conversions involve an entirely new and original use of an aircraft." (*Id.*, ¶ 10.) He explained that the actuator assemblies that include the Skurka motors and provide the "lift power for the cargo door" constitute "the first use of this motor for an original application on the aircraft." (*Id.*) Finally, he stated that,

> Eaton's customers pay OEM pricing for motors used in cargo conversions because they are being used in an OEM application in order to produce a new door assembly incorporated into the plane for the first time (an original application). Cargo conversion is not a repair or replacement of an existing motor, and is therefore not an aftermarket application.

(*Id.*, ¶ 17.)

Ibarra also discussed that aftermarket applications usually arise in emergency situations, such as when an airplane is grounded with a broken or defective part. (*Id.*, ¶ 5.) Ibarra explains that the use of motors in the cargo doors is not an "emergency job" but rather is a "planned

production job." (*Id.*, ¶ 10.) Ibarra concludes that this fact supports his contention that use of a Skurka motor in a cargo conversion is an original use.

The court finds there is a latent ambiguity in the Supply Agreement because it is not clear from the contract whether cargo conversions would fall under an OEM or an aftermarket application. Therefore, it is appropriate for this court to consider the extrinsic evidence offered by Eaton. *GenCorp*, 178 F.3d at 818. The declarations by Parker and Ibarra show that it is possible to interpret the use of a Skurka motor in a cargo conversion to be an original use. Even given the definitions of OEM and aftermarket that Skurka proposes, a cargo conversion could constitute either. In a way, it is an original aircraft in that the airplane used to be a passenger plane but after the changes is a cargo plane. However, a cargo conversion converts a passenger plane to a cargo one, so the products used in this conversion could be seen to be aftermarket uses. Therefore, the proper classification is a genuine issue of material fact, and summary judgment on this issue is improper.

## IV. CONCLUSION

The court hereby denies Plaintiff's Motion for Partial Summary Judgment (ECF No. 45).

IT IS SO ORDERED.

                                        /S/ SOLOMON OLIVER, JR.
                                        CHIEF JUDGE
                                        UNITED STATES DISTRICT COURT

March 31, 2011